## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

Claude WILLIAMS,
                    Defendant.

Crim. No. 13-548 (KM)

**OPINION**

The defendant, Claude Williams, has been indicted for conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371, seven counts of bank robbery, in violation of 18 U.S.C. § 2113(a) & (d), one count of bank robbery, in violation of 18 U.S.C. § 2113(a), and eight counts of using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Now before the court are his omnibus pretrial motions. (ECF 63) This opinion focuses on Mr. Williams's motion to suppress the statements he made to government officers after his arrest (ECF 63-4). Williams primarily asserts that the government seeks to introduce in evidence statements that it elicited by interrogation after he had invoked his right to counsel. I heard oral argument, but, finding no factual issues requiring resolution, I did not convene an evidentiary hearing.

### BACKGROUND

Mr. Williams was arrested on July 30, 2012, in North Plainfield, New Jersey. The record will bear the interpretation that he was interrupted in the process of preparing to rob a bank. He was taken to FBI headquarters for processing. There, Special Agent Michael Scimeca of the FBI and Detective Jeff VanderGroot of the Somerset County Prosecutor's Office interrogated Williams

about the attempted robbery on July 30, 2012, as well as a series of prior bank robberies.

The transcript of the recorded interrogation ("Tr.", ECF 63-14) begins with Special Agent Scimeca's scrupulous administration of the required *Miranda* warnings. Williams replies "Yes" to each warning, indicating that he understands that he has right to remain silent, that statements will be used against him, that he has a right to retained or appointed counsel, and that he may stop answering questions at any time. (Tr. 1-2) He signs a *Miranda* waiver form. (Tr. 2) He is informed that the interrogation is being recorded, and agrees to speak up so the recording will be audible. (Tr. 2)

In response to questioning, Williams acknowledges that he was arrested near the Unity Bank in North Plainfield. (Tr. 2) Scimeca then prompts Williams to speak about possible accomplices:

> MS [Special Agent Scimeca]: ...[Y]ou had made indications before that there uh, there may be some people that were not involved that you may think that we may think are involved.
>
> CW [Claude Williams]: Correct. I believe that you all may, you, you know think that other people is involved, you know, for what ever re-reasoning were there, but I'm trying to tell you that they weren't.
>
> JV [Detective VanderGroot]: Who was the person that was in the car with you today when you were stopped?
>
> CW:   Andrea.
>
> JV:   And what's her last name?
>
> CW:   Ah, Dorsey.

(Tr. 3)  Williams explains that Dorsey is a friend from the neighborhood. She sometimes drives him places, a service for which he sometimes pays her. (Tr. 3-4) Williams owns a green Taurus, which he had a friend, "Joan," register in her name. (Tr. 5-6) The morning of July 30, 2012, he drove the Taurus from Elizabeth to his brother's home in Plainfield. (Tr. 6-7) There he ran into Dorsey, and asked her to "ride [him] around" in her Volkswagen Passat. (Tr. 4, 7)

2

Williams was looking for certain people in North Plainfield he "can get money from sometime." (Tr. 7-9)

The questioning then turned to the subject of the attempted bank robbery. The claimed invocation of the right to counsel is in **bold type** at page 11. I quote the preceding two pages for context, and continue through page 12 to establish the manner in which the interrogation continued.

> **\* ECF Page 9**
>
> MS: Okay. What was your purpose in North Plainfield?
>
> CW: Well, the people that do, well the people they be in North Plainfield.
>
> MS: Okay, so the, the people that you were looking for, for the money are in North Plainfield? Okay. Um, now, here, here's the part where we have to be straight with each other.
>
> CW: Okay.
>
> MS: Okay. You understand that?
>
> CW: Okay.
>
> MS: Okay, and we said we would. We'll be honest with you.
>
> CW: Okay.
>
> MS: Everything. Now I, I mentioned to you okay, that, that you we have warrants for you for bank robbery.
>
> CW: Right.
>
> MS: Okay. So now my, my next question, okay.
>
> CW: Was I going there for that?
>
> MS: Yes.
>
> CW: Okay, now again, I want to answer the questions fairly with you right now.
>
> MS: I appreciate that.
>
> CW: Alright. I don't want to like, kill myself talking to you whatnot, cause like you said everything could be used against me.
>
> MS: No, no you're right.
>
> JV: But think about and not to cut you off.
>
> MS: Yeah.
>
> JV: But think about how a logical person would look at this, Claude, okay. Right now there are warrants for you for other bank robberies. It was I don't know, 85 degrees out there, hot, humid. We didn't fall out of the sky on top of you. We, we knew what was going to go down today, okay.

3

**\* ECF Page 10**

There's a lot of intel. A lot of we been following you obviously for quite a bit of time. We knew that you had an inkling or an eye on that bank. Okay. We can't assemble that many police officers, detectives, FBI officers that whole team on the drop of a dime. This was, this was well planned out. On our end. And ...

MS: And, on your end.

JV: On your end to some extent, because I know that you were there on Friday in the area there or about there on Saturday or Andrea was there. Following a pattern. Now what I want you to think about, before you answer anything, how a logical person is going to look at this. Here we have Mr. Claude Williams, 85 degree day wearing a sweatshirt with a hood, a bandanna around his neck, a reusable shopping bag next to him in the passenger seat of the car, all things that were used in other robberies, as well as a loaded .38 caliber revolver at his feet. We didn't put that stuff in your car. That stuff was in your car. Logically, how do you feel someone's going to look at what your intent was today?

CW: Okay, but again, all I'm telling you is that the people that you're thinking that were involved with that like that, they weren't.

JV: Okay.

MS: Okay.

JV: Fair enough. I don't care, I don't care about Andrea.

CW: Okay.

JV: Right now. I'm, I'm separating her, that's a completely different line of questioning. I'm concerned right now about Claude Williams.

CW: But what it looks like.

MS: No, we're, we're concerned about not only what it looks like but what it is Claude.

JV: What it is.

CW: Okay.

MS: Okay and wanna be straight.

**\* ECF Page 11**

CW: Okay, so let's be straight with, with it. I'm willing to like ...

JV: I would like to hear you say I'm willing to accept responsibilities for ...

**CW: I'm willing to accept for the things that I was doing and whatnot, but um, at the same time, I mean like, you, you gotta like let me be able to like talk to my lawyer, not get myself a thousand years, I mean I'm old already. I'm probably gonna die anyway.**

JV: That's the reality to face.

CW: Yeah. I, I'm aware of that.

MS: Okay.

4

CW: I'm aware of that. But all I'm trying to say ... the key thing with me right now is that you all understand that when I tell you all the other people, that's all the key thing that I really want you all to see.

MS: Well we have to understand that, but we have to get everything as a group. Okay, we have, we have to start and we have no problem with that. Okay. The fact of the matter is Claude that you have been charged already with three. Okay. The fact of the matter is you were caught, what we believe, okay, going to do another one. Okay, and I'm gonna tell you as an aside, I know it's just not three. Okay, that's what we charged you with. Okay, so there, there's a thing now. So the idea is right now how to help yourself, okay. And to help you is to be cooperative with law enforcement. Okay. And the idea is if you have a story to tell, okay, if there's people that you think that we're looking at okay, that are not involved, now's your chance to explain that.

JV: And with your concern about liking prison sentences, a man as experienced as yourself, I'm sure you know the difference between consecutive and concurrent sentencing. And you've been around the block and you know it just as well as I do, you know, there's a huge difference between consecutive and concurrent. And when things get pieced together, you know you start getting consecutive sentences you're an older man. You know, you're not, you're not that 18 year old kid that you might see the light at the end of the tunnel. You want this all, I'm assuming, again this is how I would think if I were in your predicament. All packaged into one nice ball, and get it all done, cause if not, you don't want these

**\* ECF p. 12**

gentlemen or people from my agency or other agencies to take pick it apart, pick it apart, cause now we got you. Pick it, pick it, piecing it together, piecing it together. You go federal, then you go state, then you go federal, state, it just, that ping-pong ball then at your age, let's face the facts, you're not gonna make it out.

CW: I'm finished.

JV: Yeah.

CW: I already know that.

JV: So, I would rather see it all get spilled out now.

MS: Cause we're gonna go and, and, we're gonna go and talk to the prosecutor, okay. The prosecutor's the one that drew up the paperwork and had it signed by a judge, of course. And their question to us is did he accept responsibility, you know, and was he cooperative. Okay, and there's. a big deal about being cooperative, especially in the federal system and I, I don't think you have any federal issues. Um, but there's a big time, there is a big difference between accepting responsibility, okay, um for your actions and then not, okay. And cooperating with law enforcement and not cooperating with law enforcement. And you know that's it. I mean, fine if, if you don't want to talk anymore, we're good, you know, we'll leave, however ...

CW: All I'm, all I'm trying to let you all understand like I keep saying, I'm willing to accept responsibilities for my part.

MS: Okay.

CW: Alright. But at the same time, I keep telling you all about those people you ... (UI)

MS: Well I tell you what, let's get over one hurdle at a time. If you don't mind. Okay, let's hear about your responsibility, okay. What, what was planning on happening today and what had happened in the past. We'll, we'll put that beyond us, okay, and then, and then we'll talk about ...

CW: Okay ...

(ECF 63-14, pp. 9-12; emphasis added)

Further back-and-forth ensues. The officers attempt to elicit the facts surrounding the bank robberies. Williams attempts to negotiate a deal. The officers respond that cooperation may help him win leniency, but properly stress that they can make no promises. A theme of the questioning is the strength of the case and the likelihood of very substantial prison time. Williams continues to maintain that Andrea Dorsey was not involved: "nobody else is involved with my stuff." (Tr. 26; *see also* Tr. 27 ("those people, they, they weren't. That was all me"); Tr. 31 ("JV: You're telling me that they have no involvement. CW: Yeah."))

> CW:    ... You all I had enough (UI) you all got it. Cause, I'm, I'm willing to like, I was telling you, I was getting ready to tell like do it all, if, if, let them people go.
>
> MS:    Okay, but, and again even if we, we would do that ...
>
> CW:    Cause they didn't do nothing.

(Tr. 34) Williams repeatedly objects that the officers are not releasing the other suspects. (Tr. 35)

Eventually Williams explicitly admits his commission of a number of bank robberies. Williams then refers again to a lawyer:

> CW:    Okay, well I'm, I'm sorry that I got them involved in being here or whatever, but ah, they didn't have anything to do that this is all my stupid shit, you know. And I'm, I'm with my lawyer, I'm willing to sit down and say yeah this is what I did, this is what I did, whatever, you know what I'm saying. But don't, don't seem like you all really trying to help me here.

(Tr. 36) The interview resumes, occupying another five pages of transcript.

## ANALYSIS

Williams seeks to suppress all statements elicited after his alleged request for counsel at page 11 of the transcript. *See Edwards v. Arizona,* 451 U.S. 477 (1981). He claims additionally, and in the alternative, that his statements were involuntary because they were induced by improper legal advice from his interrogators. His omnibus motions make a non-specific, blanket claim that all evidence derived from illegally obtained evidence must be suppressed as well. *See Wong Sun v. United States,* 371 U.S. 471 (1963).

### I.    *Edwards* Claim of Questioning After Request For Counsel

The record discloses that Williams was properly administered his *Miranda* warnings; that he orally acknowledged that he understood; that he signed a waiver form; and that he voluntarily began to speak to the officers. *See generally Miranda v. Arizona,* 384 U.S. 436, 469-73 (1966). The only issue is whether, during the interrogation, Williams clearly invoked his right to counsel. If so, the officers would have been required to cease interrogating him, and any statements they elicited thereafter would properly be suppressed.

A suspect who receives *Miranda* warnings and initially waives the right to counsel, as Williams did here, may be interrogated. *E.g., North Carolina v. Butler,* 441 U.S. 369, 372-76 (1979). If at any time the suspect requests counsel, however, questioning must immediately cease. *Davis v. United States,* 512 U.S. 452, 456 (1994); *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981).

> If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights."

*McNeil v. Wisconsin,* 501 U.S. 171, 177 (1991) (quoting *Michigan v. Harvey,* 494 U.S. 344, 350 (1990)).

To trigger *Edwards,* the suspect's invocation of his right to counsel must be clear. In effect, the benefit of the doubt goes to the government:

> [I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning .... Rather, the suspect must unambiguously request counsel.

*Davis,* 512 U.S. at 459.[1]

The test of ambiguity is an "objective inquiry." *Id.* at 458-459. The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Id.* at 459. *See also Alston v. Redman,* 34 F.3d 1237, 1245 (3d Cir. 1994); *Flamer v. Delaware,* 68 F.3d 710, 725 (3d Cir. 1995).

The police need not do anything in response to an ambiguous request. Contrary to some state precedent and some prior federal precedent, *Davis* held that the police, confronted by an ambiguous request, are not required to ask clarifying questions to ascertain a suspect's true intent:

> Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS officers in this case.

---

[1]    A request for counsel, however, will not be given a narrow scope. The court must bear in mind "the settled approach to questions of waiver [that] requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Connecticut v. Barrett,* 479 U.S. 523, 529 (1987).

> Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

512 U.S. at 461-62.

In assessing the ambiguity of a request for counsel, the court must consider only statements and conduct prior to the request. "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Smith v. Illinois*, 469 U.S. 91, 98 (1984) Conversely, "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 100. Just as the discovery of contraband cannot be used retroactively to establish probable cause for a search, the answers to continued interrogation cannot be used to establish that the continuation of interrogation was proper.

The focus, of course, is on the words of the suspect. That is not to say, however, that context is unimportant. The surrounding circumstances may help give context to the suspect's statements. *See Flamer*, 68 F.3d at 725 (considering statements "in light of the circumstances").

Here, Williams, having waived his *Miranda* rights, gives the officers an account of his movements up to the time of the arrest. They turn his attention to his purpose for being in that area of North Plainfield. They remind him of three outstanding warrants against him for bank robbery. Anticipating their next question, Williams asks "Was I going there [*i.e.,* to North Plainfield] for that [*i.e.,* bank robbery]?" The officers confirm that that is what they want to know.

Some verbal fencing ensues. Williams's awareness of the perils of self-incrimination suffuses his response: "Alright I don't want to like, kill myself talking to you whatnot, cause like you said everything could be used against me." (Tr. 9) The officers reply that they have been investigating him for some time, and that they "knew what was going to go down today." (*Id.*) The evidence, they remind Williams, is damning:

> JV:   On your end to some extent, because I know that you were there on Friday in the area there or about there on Saturday or Andrea was there. Following a pattern. Now what I want you to think about, before you answer anything, how a logical person is going to look at this. Here we have Mr. Claude Williams, 85 degree day wearing a sweatshirt with a hood, a bandanna around his neck, a reusable shopping bag next to him in the passenger seat of the car, all things that were used in other robberies, as well as a loaded .38 caliber revolver at his feet. We didn't put that stuff in your car. That stuff was in your car. Logically, how do you feel someone's going to look at what your intent was today?

> CW:   Okay, but again, all I'm telling you is that the people that you're thinking that were involved with that like that, they weren't.

> JV:   Okay.

> MS:   Okay.

> JV:   Fair enough. I don't care, I don't care about Andrea.

(Tr. 10)

The officers then urge Williams to be "straight" with them about his own involvement, as opposed to that of Dorsey.

> CW:   Okay, so let's be straight with, with it. I'm willing to like...

> JV:   I would like to hear you say I'm willing to accept responsibilities for ...

> CW:   **I'm willing to accept for the things that I was doing and whatnot, but um, at the same time, I mean like, you, you gotta like let me be able to like talk to my lawyer, not get myself a thousand years, I mean I'm old already. I'm probably gonna die anyway.**

(Tr. 11 (emphasis added)) The questioning continues. *See* pp. 3-5, *supra* (quoting transcript).

"[Y]ou gotta like let me be able to like talk to my lawyer" seems clear enough. A transcript, parsed in retrospect by attorneys, can always yield some claim of ambiguity. Such scrutiny, however, cannot be hypertechnical; it is spoken English, not the tax code, that we are construing. I am looking for a genuine ambiguity, one that would have been understood as such by a reasonable officer at the time.

One form of ambiguity is simple contradiction. Williams said he was "willing to accept [responsibility] for the things that I was doing ... but ... at the same time ... you gotta like let me be able to talk to my lawyer, not get myself a thousand years ...." Was Williams saying that he both would and would not talk without a lawyer? A person could, I suppose, create an insoluble ambiguity by saying "I intend to go to New York; at the same time, I'm staying home." But almost nobody really talks like that, and Williams's statement does not strike me as one of that kind. There is no logical contradiction in being willing to talk, but only in the presence of counsel. I read this statement as being more akin to the imposition of a precondition: "I intend to go to New York; at the same time, I need you to lend me train fare."

Literally, "at the same time" means "simultaneously." More figuratively, that idiom can mean "nevertheless"; "along with that"; "however."[2] The literal,

---

[2]    **at the same time**

    1. Lit. during the same moment; simultaneously. *We arrived at the same time. Too many things are happening at the same time, and I am confused.*

    2. Fig. nevertheless; however; along with that. *Bill was able to pay for the damage. At the same time, he was very angry about the accident. We agree to your demands. At the same time, we object strongly to your methods.*

McGraw-Hill Dictionary of American Idioms and Phrasal Verbs. © 2002 by The McGraw-Hill Companies, Inc.

**at the same time**

"simultaneously" sense would be dispositive—Williams would be stating that he will take responsibility only at the very moment he is talking to his lawyer. The more figurative sense of "nevertheless" is perhaps a bit more nebulous. Nevertheless—"at the same time," I might say—I think Williams's meaning is clear enough.

So consider another alternative. Was Williams saying that he didn't mind answering questions now, but that he wanted to consult with counsel at some time in the future? Yes, says the prosecution, but I think not. Williams was vividly aware that an admission of guilt would, right then and there, expose him to the risk of a long prison sentence. Shortly before his invocation of counsel, he had stated: "Alright I don't want to like, kill myself talking to you whatnot, cause like you said everything could be used against me." (Tr. 9) And when, shortly thereafter, he asked to talk to a lawyer, he gave his reason: so as to "not get myself a thousand years, I mean I'm old already. I'm probably gonna die anyway." (Tr. 11) Here, Williams clearly contemplates that his admissions might result in his dying in prison. That awareness would have been apparent to a reasonable officer.

The government argues that the reference to sentencing ("a thousand years") signifies a request for counsel later, in connection with the sentencing process. The ambiguity, says the government, is illustrated by *Edwards* itself. In *Edwards,* a Mirandized suspect was answering questions, and told law

---

1. Simultaneously, as in *We were all scheduled to leave at the same time.* This idiom was first recorded in 1526. For synonyms, see at once, def. 1; at one time, def. 1.

2. Nevertheless, however, as in *Mary agreed with her mother's criticism, but at the same time she wanted to defend her husband's views.* [c. 1700]

The American Heritage® Dictionary of Idioms by Christine Ammer. Copyright © 2003, 1997 by The Christine Ammer 1992 Trust. Published by Houghton Mifflin Harcourt Publishing Company. All rights reserved.

(Both quoted at http://idioms.thefreedictionary.com/at+the+same+time.)

enforcement he wanted to "make a deal." Having tried and failed to reach an attorney, he then told the officers "I want an attorney before making a deal." 451 U.S. at 479. Taking the government's approach here, we would say that Edwards did not clearly express a desire for an attorney's assistance in connection with answering the officers' questions—only in connection with the plea bargaining process. By that logic, they could keep questioning him, as long as they didn't "make a deal." But that interpretation cannot be squared with the holding of *Edwards*. *Edwards* did not vacate a guilty plea "deal"; it suppressed incriminating statements that Edwards made in response to interrogation (or the equivalent) after his request for counsel.

So consider a third alternative. Was Williams saying that he was willing to inculpate himself, but not Dorsey, in the absence of counsel? Such an attempt to limit a request for counsel may render it ambiguous. Thus, for example, the courts have found no clear request for counsel in connection with interrogation where a suspect agreed to answer questions orally, but not in writing, without counsel present, *Connecticut v. Barrett,* 479 U.S. 523 (1987); or where a suspect refused to take a polygraph without counsel, *Stumes v. Solem,* 752 F.3d 317 (8th Cir. 1985); *Muhammad v. Attorney General,* 2007 WL 602453 at *9 (D.N.J. Feb. 22, 2007); or where a suspect agreed to answer questions about himself, but not about others, without counsel, *United States v. Eirin,* 778 F.2d 722 (11th Cir. 1985); *United States v. Washington,* 109 F.3d 459 (8th Cir. 1997).

Williams does not state at page 11 of the transcript that he wishes to sacrifice himself for Dorsey's sake. True, Williams states early on that the officers are wrong about Dorsey's having been involved. The officers then urge Williams to talk about his own involvement. (Tr. 10) In response, Williams expresses his vital concern about his own predicament. He does not offer to inculpate himself provided that he does not have to talk about Dorsey. He gives a different and very specific reason for wanting to consult with to a lawyer: so as to "not get *myself* a thousand years." (Tr. 11; emphasis added)

13

Later, having admitted his own guilt, Williams tries to bargain for the release of Dorsey or "Teresa." (*See* Tr. 34)  Those post-request statements, however, are irrelevant to the *Edwards* issue; they are a result, not a cause, of the officers' further questioning after Williams requested counsel. *See Smith v. Illinois*, 469 U.S. at 100 ("[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.").[3]

Williams's invocation of his right to counsel is clearer than those found ambiguous in the Third Circuit case law. Thus, for example, the Court of Appeals found ambiguous a suspect's request for "permission to call his mother 'in order to inquire about bail and possible representation by counsel.'" *Flamer*, 68 F.3d at 725. That, said the court, was no more than a statement that the suspect *might* want to obtain counsel. *See also United States v. Briggs*, 347 F. App'x 750, 753-54 (3d Cir. 2009) (discounting suspect's statement that he did not want to answer questions until he found out whether his mother had obtained counsel, but also finding, assuming it occurred, that it was ambiguous). Similarly, continued questioning was not barred by a suspect's statement that counsel had allegedly given him the unique advice to cooperate "unless he 'got stumped.'" *United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012).

Mr. Williams's words here are declarative and forceful: "[Y]ou gotta like let me be able to like talk to my lawyer..." (Tr. 12). He is not asking whether he needs a lawyer, as in *U.S. v. Wysinger*, 683 F.3d 784 (7th Cir. 2012) ("I mean,

---

[3]    For the same reason, I give no particular consideration to a second reference to counsel much later in the transcript:

> CW:    Okay, well I'm, I'm sorry that I got them involved in being here or whatever, but ah, they didn't have anything to do that this is all my stupid shit, you know. And I'm, I'm with my lawyer, I'm willing to sit down and say yeah this is what I did, this is what I did, whatever, you know what I'm saying. But don't, don't seem like you all really trying to help me here. (Tr. 36)

14

do you think I should have a lawyer? At this point?" is not an unambiguous request for counsel). Nor is he asking whether it is logistically possible for an attorney to be made available, as in *U.S. v. Shabaz*, 579 F.3d 815 (7th Cir. 2009) (question "[A]m I going to be able to get an attorney?" found ambiguous). Nor is he mulling aloud the desirability of an attorney, as in *Davis*, 512 U.S. at 462 (1994) ("Maybe I should talk to a lawyer" found ambiguous).

Closest to Williams's facts, but still distinguishable, is the Seventh Circuit case of *United States v. Hampton,* 675 F.3d 720, 727-28 (7th Cir. 2012) (discussed in *United States v. Hunter, supra,* 708 F.3d at 946). That suspect, Hampton, seemingly changed his mind: he first signed a *Miranda* waiver, then later refused to answer further questions without an attorney. Questioning immediately ceased. Thereafter, Hampton approached a guard and volunteered that he now wished to proceed without counsel. The police re-administered *Miranda* warnings and again asked Hampton if he wanted an attorney. He replied "Yeah, I do, but you ..." (apparently trailing off). Hampton wavered, asking the police how the presence of an attorney "would affect his situation." The police tried to answer his questions, emphasizing that Hampton had to decide, "yes or no," and stating that there would be "no hard feelings" if the answer was yes. Hampton began fishing for a deal, while making incriminating statements. During that process, among his equivocal statements was one that "I think, I, I felt like it should have been an attorney here cause that's what I asked for." The Seventh Circuit upheld the district court's finding that, in context, Hampton had not clearly and unambiguously requested counsel.

Williams's statement does not approach the ambiguity of "I do, but...";  moreover, the context is different. Hampton changed his mind and re-instigated questioning of his own volition. The police scrupulously re-Mirandized him and repeatedly tried to ascertain his true intentions — the "good police practice" identified but not required by the Supreme Court in *Davis, supra.* Here, the officers, not Williams, reinstituted the interrogation after the alleged request for counsel. There was no attempt to re-administer

15

warnings, nor were there any clarifying questions that might have undercut Williams's expression of intent.

I think Williams's request for counsel was clear, and that it required the officers to cease their interrogation. I reach that conclusion reluctantly. The transcript, especially those portions following the request for counsel, reveal that Mr. Williams is shrewd, and may well have desired to have it both ways. But *Edwards* lays down a bright-line rule, and its test is an objective one. The suspect, having asked for counsel, may not be questioned further; that right does not depend on his subjective motives. If the suspect clearly *expressed* a desire for an attorney, it is not for the court or the police to say that he did not really want one.

I am also sensitive to the temptations of 20/20 hindsight. Overall, these officers conducted the interrogation professionally, without resort to unfair manipulation or coercive tactics. I intend no criticism when I say that my analysis of the transcript has yielded a different conclusion from that reached by the officers at the time. This is a case that might have benefited from the "good police practice" identified in *Davis* of asking a follow-up question to clarify the suspect's intent; I do not suggest, however, that this was required.

Mr. Williams's invocation of the right to counsel was clear. I therefore will suppress all statements following that request for counsel, which occurs at page 11 of the transcript.

## II.    VOLUNTARINESS

Behind the rule of *Miranda* is always the fundamental constitutional issue of whether the suspect's statements were voluntary. I find no evidence, or even really a substantial allegation, that Mr. Williams's will was overborne by the officers. *See generally Halsey v. Pfeiffer,* 750 F.3d 273, 304 (3d Cir. 2014) (ultimate question is "whether the defendant's will was overborne when he confessed"). The motion to suppress his statements as involuntary is denied.

16

Williams does not claim that he did not understand the *Miranda* warnings or could not effectively waive them. There is no evidence or allegation that the officers applied undue force, deprived him of sleep, or wore him down. The entire interview lasted just over an hour. The officers were polite, respectful, and professional. To be sure, they employed such classic techniques as showing empathy, portraying the evidence as overwhelming, and so on. Such psychological techniques, and even the use of deception (up to a point), are permissible. *See Halsey,* 750 F.3d at 304; *see also Frazier v. Cupp,* 394 U.S. 731, 739 (1969)).

I make the general observation that Williams is obviously intelligent, and that he appears to have understood perfectly what went on in the interview. He remained self-possessed throughout, responding appropriately to the officers' questions and looking out for his own interests. The record raises no concerns about his capacity to deal with the situation or his susceptibility to being taken advantage of.

Williams claims that his statements were involuntary because the officers gave him "misleading legal advice" about the likelihood of leniency. In the transcript, however, the officers go no farther than to state that acceptance of responsibility and cooperation would be brought to the attention of the prosecutor. They carefully warn Williams that they cannot make any promise of leniency; that the selection of charges will be in the hands of a prosecutor; and that the imposition of sentence will be in the hands of a judge. (*See* Tr. 11-14) As for promising a sentence reduction, Detective VanderGroot says, "I'd be looking for a new job if I did that." (Tr. 14) The officers do state that the sentences for bank robbery with a gun are "through the roof." (Tr. 22-23) Making due allowances for the colloquialism, that is not inaccurate. *See* 18 U.S.C. §§ 2113(a) (20 year maximum), 924(c)(1)(A) (adding 5, 7, or 10 years, depending on the manner in which a firearm was employed). The officers state that they have seen cases of leniency, and that Williams should give himself a chance. (Tr. 27) They repeatedly use the word "[h]ope, cause I can't promise

17

you anything and I told you that right from the get-go....Hope, that you get sentenced concurrently and that whole pile instead of being nine different jobs becomes one." (Tr. 30)

All of this fails to cross the line that separates legitimate interrogation from a deceptive promise of leniency. And in any event, a promise to recommend leniency does not in itself render a statement involuntary. Thus, for example, "although ... agents suggested that cooperation would be in defendant's best interests because 'it would be made known to the prosecutors and judge ... this falls far short of coercion." *United States v. Romano,* 2013 U.S. Dist. LEXIS 133613 at *16-*17 (E.D.N.Y. Sept. 18, 2013). *See also United Staes v. Corbett,* 750 F.3d 245, 253 (2d Cir. 2014) (vague promises of leniency for cooperation, as opposed to promises or misrepresentations, do not negate voluntariness).

The officers here did not mislead Williams in a manner that undermines the voluntariness of his statements. Their general statements about bringing his cooperation and honesty to the attention of the prosecutor and judge were accompanied by careful warnings that they could promise nothing. Such comments fall well on the side of permissibility.

Williams's motion to suppress his statements as involuntary is denied.

## III.  EVIDENCE DERIVED FROM SUPPRESSED STATEMENTS

Mr. Williams moves generally to suppress evidence derived from evidence that has itself been obtained wrongfully, citing *Wong Sun v. United States,* 371 U.S. 471 (1963) (the "fruit of the poisonous tree" doctrine). I have suppressed his post-arrest statements, starting at page 11 of the transcript, not because they were involuntary, but because they violated the rule of *Miranda* and *Edwards.* Williams's motion does not identify any particular "fruits" that must be suppressed.

18

In *Oregon v. Elstad,* 470 U.S. 298 (1985), the Supreme Court reasoned that the *Miranda* exclusionary rule sweeps more broadly than the Fifth Amendment requirement that statements be voluntary; that is, *Miranda* bars many statements that might be voluntary in fact. *Id.* at 306. *Elstad* held that the "fruits" or "derivative use" doctrine does not apply to a statement that is voluntary, although in violation of *Miranda. Id.* at 307. Later courts held, and I agree, that *Elstad* applies in the closely-related context of an *Edwards* violation. *See, e.g., United States v. Cannon,* 981 F.2d 785, 789 (5th Cir. 1993) ("derivative evidence doctrine is not triggered by an *Edwards*-style violation")(cited in *Burgess v. Dretke,* 350 F.3d 461, 469 n.20 (5th Cir. 2003)); *Howard v. Moore,* 131 F.3d 399, 413-14 (4th Cir. 1997) (fruits doctrine not applicable to *Miranda* or *Edwards* violation, because no constitutional violation).

In *Dickerson v. United States,* 530 U.S. 428 (2000), the Supreme Court elevated the *Miranda* rule to constitutional status, holding that it could not be abridged by the legislature. *Dickerson* could be read to cast doubt on prior holdings that the "fruits" doctrine does not apply to *Edwards* violations, because they are not of constitutional stature. It could even be read to undermining *Elstad* itself, which relied on a similar distinction between the Fifth Amendment requirement of voluntariness and the broader, prophylactic rule of *Miranda.*

In *United States v. DeSumma,* 272 F.3d 176 (3d Cir. 2001), however, the Court of Appeals held that that *Elstad's* holding was unaffected by *Dickerson*:

> We cannot agree with the defendant's reading of *Dickerson* because the Supreme Court appeared to anticipate and reject it. The Court explained that "[o]ur decision in [ *Elstad*]—refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases-does not prove that Miranda is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned

19

> interrogation under the Fifth Amendment." 530 U.S. at 441,
> 120 S.Ct. 2326.
>
> *Dickerson* thus continued to observe the distinction between
> Miranda's application to cases involving the Fifth, rather
> than the Fourth, Amendment. Ultimately, the Fifth
> Amendment prevents the use of the non-Mirandized
> statement rather than the introduction of derivative
> evidence.

*Id.* at 180. *DeSumma* held that "the fruit of the poisonous tree doctrine does
not apply to derivative evidence secured as a result of a voluntary statement
obtained before *Miranda* warnings are issued." *Id.* The reasoning of *DeSumma*,
given due latitude, requires that the "fruits" or "derivative use" doctrine not
apply to a statements, like these, that were obtained voluntarily but in violation
of the rule of *Edwards*.

Williams's suppression motion is denied insofar as it seeks to exclude
evidence as fruits of the *Edwards* violation found in Part I, above.

Questions remain, however, because neither side has been clear. The
defendant's motion generally requests that all derivative evidence be
suppressed. The government responds that Williams's "spontaneous"
statements during the booking process that followed the interview should not
be suppressed. (Gov't Br. at 106) According to the government's brief, at
booking, Williams continued to make statements to the effect that he wanted to
take responsibility for his actions. There is no further significant description,
but such evidence might be cumulative of unsuppressed statements from the
interrogation transcript.

The police are entitled to ask a suspect routine questions for the purpose
of booking. *Miranda* does not ordinarily come into play because the answers to
such questions are usually not testimonial in nature. That is not to say,
however, that testimonial answers may be elicited in violation of *Miranda*
merely because they occur in the context of booking. *See Pennsylvania v.
Muniz*, 496 U.S. 582 (1990) (suppressing answer to question about the date

20

suspect's sixth birthday because, under the circumstances of the case, it had testimonial content).

I therefore take the government's argument to rely, not so much on the "booking" aspect as on the "spontaneous" aspect. These statements, says the government, were not made in response to interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 302 (1980); *United States v. Cole,* 315 F.3d 633, 636 (6th Cir. 2003).[4] If so, the government may have a good argument for admitting the statements. On the other hand, if interrogation continued, then so did the *Edwards* violation; it is not a question of whether the answers "derived" from an earlier violation.

The motion of Williams, who has the burden of coming forward, did not place the facts surrounding these "spontaneous" statements in issue. It is possible that he does not disagree with the government's account, or it may be that he was not placed on notice of the government's claim. The parties will be prepared to discuss the necessity, or not, of a hearing at an upcoming scheduled conference.

The motion to suppress is, however, provisionally denied as to statements that can be shown to have been spontaneous, and not the result of questioning in violation of *Edwards.*

---

[4]    The duty to refrain from questioning may be extinguished where the suspect himself "reinitiates conversation." *Davis,* 512 U.S. at 458 (quoting *Edwards,* 451 U.S. at 484-485 ("But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.")  That exception, however, seems to contemplate the situation in which the police *did* cease questioning in response to a request for counsel.

**CONCLUSION**

For the foregoing reasons, the motion to suppress is GRANTED as to statements by Williams after the request for counsel at page 11 of the transcript, pursuant to *Edwards, supra*; DENIED insofar as it claims that post-arrest statements were involuntary; DENIED insofar as it seeks exclusion of "fruits" or evidence derived from the *Edwards* violation, subject to the reservation of issues regarding the alleged statements during booking, as described above. A separate order will issue on February 18, 2015.

Dated: February 17, 2015

KEVIN MCNULTY, U.S.D.J.